# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BEG INVESTMENTS, LLC,        :
                                       :

        Plaintiff,             :        Civil Action No.:    13-cv-182 (RC)
                                         :

        v.                      :        Re Document No.:    4
                                         :

NICHOLAS ALBERTI, *et al.*,     :
                                       :

        Defendants.          :

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

Plaintiff, BEG Investments, LLC, is a company that operates a restaurant located at 1123 H Street, NE, known as Twelve Restaurant and Lounge. The Defendants are members of the Alcohol Beverage Control Board, established by D.C. Code §25-201. Pursuant to the Alcoholic Beverage Statute, the ABC Board has the authority to "issue licenses to persons who meet the requirements set forth" in the statute, and to impose "certain conditions" on those licenses if the Board "determines that the inclusion of the conditions will be in the best interest of the locality . . . where the licensed establishment is to be located." D.C. Code §25-104(a), (e). Pursuant to this authority, Defendants issued a license to the Plaintiff upon the condition that Plaintiff hire the Metropolitan Police Department ("MPD") to patrol the area surrounding Twelve Restaurant and Lounge. Plaintiff asserts that the Defendants acted beyond their statutory authority in imposing this condition upon Plaintiff's license.

Plaintiff now brings suit against the Defendants in their individual capacity alleging: 1) racketeering in violation of 18 U.S.C. §1962(c); 2) conspiracy to commit racketeering in

violation of 18 U.S.C. §1962(d); 3) deprivation of equal protection of the law; 4) deprivation of property interests pursuant to the Takings Clause of the Fifth Amendment; 5) deprivation of freedom of speech under the First Amendment; and 6) conspiracy to deprive Plaintiff of the equal protection of the laws in violation of 42 U.S.C. §1985. Defendants move to dismiss under Rule 12(b)(6) for a failure to exhaust judicial remedies, and failure to state a claim. For the reasons set forth below, Defendants' motion to dismiss is granted, but Plaintiff is granted leave to amend his claims brought pursuant to the Equal Protection Clause and the First Amendment.

## II. FACTUAL ALLEGATIONS

Plaintiff, BEG Investments, LLC, is a company that operates a restaurant located at 1123 H Street, NE, known as Twelve Restaurant and Lounge.  Plaintiff has sued Defendants, Nicholas Alberti, Donald Brooks, Herman Jones, Calvin Nophlin, Mike Silverstein, and Ruthanne Miller in their individual capacities for a violation of its rights under several statutory and constitutional provisions, detailed below.  The Defendants are members of the Alcohol Beverage Control Board ("ABC Board"), established by D.C. Code §25-201.

The ABC Board has oversight authority over the Alcoholic Beverage Regulation Administration ("ABRA"), which advises the ABC Board and provides "professional, technical, and administrative staff assistance to the Board in the performance of its functions." D.C. Code §25-202. Pursuant to the Alcoholic Beverage Statute, the ABC Board has the authority to "issue licenses to persons who meet the requirements set forth" in the statute, and to impose "certain conditions" on those licenses if the Board "determines that the inclusion of the conditions will be in the best interest of the locality…where the licensed establishment is to be located." D.C. Code §25-104(a), (e).

In 2005, the District of Columbia City Council amended a bill relating to emergency suspension of liquor licenses to include a provision permitting licensees to enter into "Reimbursable Detail" agreements for "MPD officers to patrol the surrounding area of an establishment for the purpose of maintaining public safety, including the remediation of traffic congestion and the safety of public patrons, during their approach and departure from the establishment." D.C. Code § 25-798 (a)(3); Emergency Suspension of Liquor Licenses Act of 2005, D.C. Act 16-20. This new code section provided for "compensation of the MPD by the licensee when reimbursable details are requested by the licensee." D.C. Code § 25-798 (a)(1).

Plaintiff alleges that on June 22, 2011, Defendants issued an Order pursuant to their authority as the Alcoholic Beverage Control Board, ordering Plaintiff to "hire the MPD Reimbursable Detail whenever the establishment provides any entertainment permitted by the establishment's entertainment endorsement." ABRA Order 2011-289 at 5, June 22, 2011; Compl. ¶26, Feb. 11, 2013, ECF No. 1. Plaintiff moved for reconsideration of the Order. Compl. ¶29. After conducting a hearing, Defendants ordered Plaintiff to "hire the MPD Reimbursable Detail whenever the establishment provides any DJs or live music as entertainment at the establishment. The MPD Reimbursable Detail shall be hired for a minimum of four hours and shall end no sooner than one hour after closing." ABRA Order 2011-368 at 2, Aug. 10, 2011. According to Plaintiff, this Order required it to retain MPD officers at a rate of over $55 per hour per officer — more than double the basic daily wage rate of policemen. Compl. ¶32. On October 9, 2011, Plaintiff did not employ a Reimbursable Detail, and was subsequently fined $1,500 by the Defendants. Compl. ¶33. Plaintiff asserts that it has paid thousands of dollars to the MPD as a result of the Reimbursable Detail Order. Compl. ¶34.

In addition to the Plaintiff, several other companies' licenses have been conditioned upon a Reimbursable Detail. On July 27, 2011, the Defendants conducted a fact-finding hearing after Police Commander Daniel Hickson requested that Night and Day Management, LLC pay for a Reimbursable Detail at Fur Nightclub. Compl. ¶41. On August 17, 2011, Defendants ordered as follows:

> [Night and Day Management, LLC] must secure MPD Reimbursable Detail, commencing September 1, 2011, for each night that the Licensee is open to the public for business. For those nights that Reimbursable Detail is required; there must be a minimum of four officers, it must be present for a minimum of four hours and it must remain at the establishment for an additional 30 minutes after closing.

ABRA Board Order 2011-356 at 14, Aug. 17, 2011. A similar order was issued against Inner Circle 1420, LLC for a Reimbursable Detail at Lotus Lounge:

> [Inner Circle 1420, LLC] must continue to secure MPD Reimbursable Detail for each night that the Licensee is open to the public for business. For those nights that Reimbursable Detail is required; there must be a minimum of four officers, it must be present for a minimum of four hours and it must remain at the establishment for an additional 30 minutes after closing.

ABRA Board Order 2011-407 at 14, Oct. 5, 2011. On March 31, 2012, John M. Hedgecock wrote a memorandum recommending that the number of MPD officers assigned to Lotus Lounge's Reimbursable Detail be increased. Compl. ¶61. When Inner Circle failed to pay for the Reimbursable Detail, enforcement action was brought against it, Inner Circle was fined, and Lotus Lounge's operations were suspended for six days. Compl. ¶69.

Plaintiff lists two other similar instances. Bar 9, LLC, a limited liability company operating a nightclub known as DC9, was the subject of a "Summary Suspension Status Hearing" conducted by the ABC Board on December 1, 2010. Compl. ¶72. Following the hearing, the Board ordered Bar 9 to "contract with MPD to secure a Reimbursable Detail for no fewer than two officers and no less than the hours of operation on any given night the club is

open through January 19, 2011." ABRA Board Order 2010-609 at 7, Dec. 1, 2010. The ABC Board imposed a Reimbursable Detail on Non-party Guards, Inc., operating a restaurant known as The Guards, in August 2008, requiring MPD officers to be present "Friday and Saturday evenings between 11:00 p.m. and 3:00 a.m." Compl. ¶78. This Order was appealed to the ABC Board, and the appeal was denied. Compl. ¶79.

Plaintiff alleges that the Board's imposition of a mandatory Reimbursable Detail is outside the scope of its authority, and violates several provisions of the D.C. Code. Specifically, Plaintiff brings suit against the Defendants in their individual capacity alleging: 1) racketeering in violation of 18 U.S.C. §1962(c); 2) conspiracy to commit racketeering in violation of 18 U.S.C. §1962(d); 3) deprivation of equal protection of the law; 4) deprivation of property interests pursuant to the Takings Clause of the Fifth Amendment; 5) deprivation of freedom of speech under the First Amendment; and 6) conspiracy to deprive Plaintiff of the equal protection of the laws in violation of 42 U.S.C. §1985. Defendants move to dismiss under Rule 12(b)(6) for a failure to exhaust administrative remedies, and failure to state a claim.

### III. LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It

is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## IV. ANALYSIS

### A. Exhaustion and Abstention

As a threshold matter, Defendants argue that Plaintiff's claims for declaratory and injunctive relief should be dismissed because: 1) the Plaintiff failed to exhaust available state judicial remedies; 2) the claims should properly be heard in state court pursuant to the *Burford* abstention doctrine; and, 3) the claims should properly be heard in state court pursuant to the *Pullman* abstention doctrine. If the Court dismissed the Plaintiff's complaint for any of these reasons, Plaintiff would be required to seek relief in state court —the local D.C. Court system.

The Court considers each argument in turn, and ultimately finds that the case is properly in Federal court, and that this Court can retain jurisdiction over the merits of Plaintiff's complaint.

### 1. Failure to Exhaust State Judicial Remedies

Defendants argue that Plaintiff's challenge to the ABC Board's order in Federal court is nothing more than a deliberate attempt to bypass the "orderly procedure of the state courts," where the Plaintiff has an accessible and available remedy "capable of awarding a full measure of relief." *Fox v. Dist. of Colum.*, 851 F. Supp. 2d  20, 28 (D.D.C. 2012).  Specifically, the Defendants believe that the Plaintiff should have exhausted the judicial remedies available to the Plaintiff under the D.C. Administrative Procedure Act ("D.C. APA"), which allows the Plaintiff to petition the D.C. Court of Appeals for review of an agency's orders or decisions. D.C. Code §2-510.  Plaintiff did not file a challenge to the Board's action under the D.C. APA. Thus, Defendants argue that the Plaintiff has failed to exhaust available state judicial remedies, and the case should be dismissed.

"Federal relief may be withheld from persons who have deliberately bypassed the orderly procedure of the state courts. " *Fox*, 851 F. Supp. 2d at 28 (quoting *Sullivan v. Murphy*, 478 F.2d 938, 963 (D.C. Cir. 1973) (internal quotation marks omitted). However, exhaustion of state judicial remedies "is appropriate, as a reason for denial of Federal relief, *only* when there has been a failure to utilize state remedial channels that are both accessible and capable of affording a full measure of relief." *Sullivan*, 478 F.2d at 53 (emphasis added).

The Plaintiff first engaged in the administrative process provided in the Alcohol Beverage Regulation. D.C. Code §25-431. After receiving an unfavorable order, Plaintiff filed for reconsideration with the ABC Board. It was only after the reconsideration hearing, and other petitions in front of the Board requesting an exemption, that Plaintiff brought suit in this Court.

The only remedy remaining to Plaintiff at this stage, and indeed the only step that Defendants argue Plaintiff should have taken prior to bringing suit in Federal court, is to appeal the Board's order to the D.C. Court of Appeals under the D.C. APA. Def.'s Mot. to Dismiss, 5, May 1, 2013, ECF No. 4.

The D.C. APA provides, in relevant part, that "[u]pon filing of a petition for review, the [D.C. Court of Appeals] shall have jurisdiction of the proceeding, and shall have power to affirm, modify, or set aside the order or decision complained of, in whole or in part, and, if need be, to remand the case for further proceedings." D.C. Code §2-510(a). The D.C. Court of Appeal's review is limited to the issues and facts subject to review on appeal, and the power of the Court is limited "[s]o far as necessary to… decide all relevant questions of law, to interpret constitutional or statutory provisions, and to determine the meaning or applicability of the terms of any action." D.C. Code §2-510(a)(1). The D.C. Court of Appeals is not granted any right to award damages. At best, it may compel an agency action that was "unlawfully withheld or unconstitutionally delayed" or may "hold unlawful or set aside" an agency action that it finds to be unlawful. D.C. Code §2-510(a)(2) – (3). Moreover, the D.C. APA only grants the D.C. Court of Appeals jurisdiction to review agency action. D.C. Code §2-510(a) ("If the jurisdiction of…an agency is challenged…the person challenging…shall be entitled to an immediate judicial review of that [agency] action."). By definition, this jurisdiction to review agency action does not extend to suits against individuals in their non-official capacity, as those individuals have no power to act as a state agent while also acting in their individual capacity. Thus, Plaintiff likely could not bring claims under the D.C. APA against the Defendants in their individual capacity, as it has done here.

Although the D.C. APA provided the Plaintiff with another avenue to challenge the Board's order, the Court finds that the D.C. Court of Appeals could not have granted the Plaintiff the complete remedy it seeks here, and thus the Plaintiff is not precluded access to the Federal courts. The mere fact that an action "is also maintainable in state courts, or in the local courts in the District of Columbia" is not itself sufficient to "foreclose access to the Federal courts, or require prior exhaustion of such State or local remedy." *Sullivan*, 478 F. 2d at 963. Failure to exhaust should only bar relief where the state remedial channels "are capable of affording a full measure of relief." *Id.* Where, as here, "a more complete remedy is required to vindicate [the Plaintiff's] Federal…rights, the exhaustion doctrine does not preclude access to the Federal Court." *Id.*

Although the D.C. APA can provide Plaintiff with an opportunity to review the Board's decision, the D.C. Court of Appeal's review is severely limited in scope. First, the D.C. Court can only grant declaratory or injunctive relief — it cannot grant Plaintiff any request for damages. Moreover, the D.C. Court may, and has in the past, merely remanded the decision to the Board for a review of its internal proceedings. Pl.'s Opp'n at 28. Such a remand could allow the Board to reverse this singular order, without any decision on the legality of its mandate, and without compensating the Plaintiff for any loss that occurred while it was required to comply with the Board's Order. Finally, D.C. APA review could only review the reasonableness of the Board's decision. It does not vindicate Plaintiff's quasi-tortious claims of intentional fraudulent or discriminatory conduct by the individual Defendants, which is outside of the scope of the D.C. Court's APA review.

Defendants rebut this argument by arguing that Plaintiff's failure to first pursue its remedy in the D.C. Courts was the ultimate cause of their injuries. Def.'s Reply, 3. Indeed,

Defendants seem to believe that Plaintiff's alleged injuries supporting its RICO and Hobbs Act claim "would not exist" if it had merely appealed the ABC Board's decision to the D.C. Court of Appeals. In support of this proposition, Defendants cite to *Heck*, which barred a criminal defendant from seeking damages under 42 U.S.C. §1983 "unless [he] can demonstrate that the conviction or sentence *has already been invalidated.*" Def.'s Reply, 3, May 28, 2013, ECF No. 7 (quoting *Heck*, 512 U.S. at 486-87). Analogously, Defendants argue, the Plaintiff should not be afforded Federal relief for "self-inflicted injures due to a failure to exhaust administrative remedies." Def.'s Reply, 3.

Defendants never clearly articulate how the Plaintiff's failure to seek D.C. APA review is akin to a "self-inflicted injur[y]." Moreover, the Court finds Defendants' reliance on *Heck* to miss the mark. *Heck* does not stand for the proposition that every individual seeking review of an action must first obtain a court-ordered invalidation of the action prior to seeking damages. *Heck* only finds that in the specific claim for *malicious prosecution* under 42 U.S.C. §1983, one element that must be alleged and proved "is termination of the prior criminal proceeding in favor of the accused." *Heck*, 512 U.S. at 484. The Supreme Court did not extrapolate this finding to 42 U.S.C. §1983 claims generally, and reiterated that "[w]e do not engraft an exhaustion requirement upon §1983, but rather deny the existence of a cause of action" for the claim brought in *Heck. Id.* at 489.

For these reasons, this Court finds that Plaintiff's rights could not have been fully vindicated by D.C. APA review, and that the failure to first pursue a claim in the D.C. Court of Appeals does not preclude access to Federal Court.

## 2. *Burford* and *Pullman* Abstention

Defendants argue, in a footnote, that "to the extent that any additional abstention doctrine is necessary, the *Burford* and *Pullman* abstention doctrines are also applicable to this case" and should thus preclude this Court's review. Def.'s Reply at 2, n.1. The Defendants note that review of the Board's action would require this Court to decide a "difficult question[ ] of [local] law bearing on policy problems of substantial public import," *id.*, and that review in the D.C. Court of Appeals is thus more appropriate. The Court does not find that either the *Burford* or *Pullman* abstention doctrines preclude federal review of this matter, and thus does not dismiss the case on this basis.

The *Burford* abstention doctrine, first articulated in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), urged a federal court "sitting in equity" to decline jurisdiction where a case "presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the case then at bar." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726 (1996) (quoting *Colorado River Water Consv. Dist., v. United States*, 424 U.S. 800, 814 (1976)) (internal quotation marks omitted). However, as the Supreme Court has repeatedly recognized, whether a Federal court should dismiss a case under the *Burford* abstention doctrine is a question of a balance of factors, and the "balance only rarely favors abstention." *Quackenbush*, 517 U.S. at 728. "The power to dismiss recognized in *Burford* represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" *Id. quoting Colorado River*, 424 U.S. at 813.

In *Burford* itself, the Supreme Court relied on three factors in abstaining from the case: 1) "the difficulty of the regulatory issues presented," 2) "the demonstrated need for uniform regulation in the area," and 3) "the detrimental impact of ongoing federal court review of the

Commission's orders, which . . . had already led to contradictory adjudications." *Id.* at 725. In *Burford*, the state Railroad Commission was granted *exclusive* regulatory authority in the area of oil regulation, "[d]ue to the potentially overlapping claims of the many parties who might have an interest in a common pool of oil and the need for uniform regulation of the oil industry." *Id.* at 723.

No such factors are present here. Defendants have not sufficiently articulated a basis to find that liquor licensing is an area in which complicated regulatory issues are presented, nor that finite resource over which many parties may have a common claim need to be adjudicated. Although the Board must consider and balance several interests when granting licenses, this Court's review of the Reimbursable Detail mandate will not disrupt the Board's larger regulation of liquor licenses. Although the ABC Board promulgates a regulatory scheme, *Burford* "does not require abstention whenever there exists [a complex state administrative process], or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362 (quoting *Colorado River*, 424 U.S. at 815-16).

Moreover, as already discussed above, D.C. APA review of the agency action would not afford the full relief requested by the Plaintiff. Because Defendants have failed to show that the sort of complex state regulatory scheme discussed in *Burford* is at issue here, the Court does not dismiss the case pursuant to *Burford* abstention doctrine.

The Court similarly will not dismiss the claims pursuant to the *Pullman* abstention doctrine. The Supreme Court held, in *Railroad Commission of Tex. v. Pullman Co.*, that when a "federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication," it should refrain from deciding the issue and instead

defer to the state courts. 312 U.S. 496, 500 (1941). This doctrine "avoid[s] the waste of a tentative decision as well as the friction of a premature constitutional adjudication" on a constitutional issue that would be mooted by resolution of the state law issue. *Id.*

However, *Pullman* abstention does not require the Court to dismiss the case at bar. First, even if there were a state-law question that needed to be resolved in the first instance, *Pullman* provides no basis for dismissing this case. Instead "abstention may serve only to postpone, rather than to abdicate jurisdiction, since its purpose is to determine whether resolution of the federal question is even necessary, or to obviate the risk of a federal court's erroneous construction of state law." *Allen v. McCurry*, 449 U.S. 90, 101-02 n.17 (1991). Because there is no concurrent state court action to vindicate Plaintiff's claims, postponement would serve no purpose. Second, not all of Plaintiff's Federal constitutional claims are dependent upon the authority of the Board to impose a mandatory Reimbursable Detail. Plaintiff alternatively argues that even if the Board had the statutory authority to issue such conditions on licenses, the mandatory Reimbursable Detail was unconstitutionally applied. Compl. ¶91-104. For these reasons, the Court cannot, and does not dismiss the case under the *Pullman* abstention doctrine.

### B. Plaintiff's Claims for Declaratory and Injunctive Relief

Plaintiff sues Defendants, members of the ABC Board, only in their individual capacities. In addition to monetary damages, Plaintiff seeks declaratory and injunctive relief against Defendants. Specifically, Plaintiff asks this Court to "declare the imposition of a Reimbursable Detail upon its establishments without its consent to be unlawful" and to "enjoin the Defendants from imposing such unlawful Reimbursable Details upon it." Compl. ¶109-10. However, Defendants can only impose these Reimbursable Details in their official capacity, as members of

the ABC Board. *See* D.C. Code §25-104(e) (granting the ABC Board authority to place conditions upon licenses, in the interest of the locality).

Courts have concluded that "there is no basis for suing a government official for declaratory and injunctive relief in his or her individual or personal capacity." *Hatfill v. Gonzales*, 519 F. Supp. 2d 12, 19 (D.D.C. 2007). *Accord Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) (finding that a declaration that the challenged policy was unconstitutional and an injunction barring the defendants from implementing the policy in the future can be obtained only from the defendants in their official capacities and not as private individuals) *See also, Cmty. Mental Health Servs. of Belmont v. Mental Health and Recovery Bd. Serving Belmont, Harrison & Monroe Counties*, 150 Fed. Appx. 389 (6th Cir. 2005); *Ameritech Corp. v. McCann*, 297 F.3d 582, 587 (7th Cir. 2002); *Frank v. Relin*, 1 F.3d 1317, 1327 (2nd Cir. 1993); *Del Raine v. Carlson*, 826 F.2d 698, 703 (7th Cir.1987). "[O]nly by acting as a government official (not as an individual acting personally), can a public official's compliance with a court decree remedy the governmental action, policy or practice that is being challenged." *Hatfill*, 519 F. Supp. 2d at 26. Because Plaintiffs only sue Defendants in their individual capacities, and not also in their official capacities, this Court is unable to grant any injunctive or declaratory relief for Plaintiff.

### C. RICO and Hobbs Act Claims

Plaintiff brings claims under the Racketeer Influenced and Corrupt Influences Act ("RICO"). 18 U.S.C. §1962(c)-(d). This statute states in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Defendants move to dismiss these claims under Fed. R. Civ. P. 12(b)(6), for failure to state a claim. Specifically, Defendants argue that Plaintiff 1) has not adequately pleaded that the reimbursable detail is an "enterprise which affects interstate commerce," and 2) asserts a "pattern of racketeering activity" by wrongly assuming that the Board's action is unlawful. Moreover, Defendants argue that they are entitled to qualified immunity. The Court concludes that Defendants are entitled to qualified immunity on the RICO and Hobbs Act claims because Plaintiff has failed to allege that Defendants' imposition of a Reimbursable Detail violated clearly established law. [1]

The Plaintiff argues that Defendants violated its statutory rights under RICO by engaging in a "pattern of racketeering activity." Plaintiff's complaint alleges that each defendant participated in a racketeering activity by: "demanding payment to the Reimbursable Detail program without lawful authority," "employ[ing] wrongful fear of economic harm to obtain the property of the Plaintiff," and "employ[ing] wrongful actual economic harm to obtain the property of the Plaintiff." Compl. ¶86. As Defendants correctly note, Plaintiff's allegations of racketeering turn on whether the Defendants' actions in imposing the Reimbursable Detail was outside of their lawful authority. Because Plaintiff's claim of "racketeering" rests wholly on whether the Defendants were acting within their legal authority, and because Defendants claim qualified immunity, this Court must determine whether it was clearly established, in June 2011,

_____

[1] The Court notes that the Plaintiff likely alleges sufficient facts with regards to the interstate commerce element, and thus meets the pleading standard under the Federal Rules of Civil Procedure. *See e.g.*, *United States v. Doherty*, 867 F.2d 47, 68 (1st Cir. 1989) ("RICO requires no more than a slight effect upon interstate commerce"( *citing United States v. Robinson*, 763 F.2d 778, 781 (6th Cir. 1985) (RICO requires only a "minimal impact" on commerce, e.g., that alcohol sold by defendants was made out of state)). However, the Court need not decide this issue here, because the Court finds that the Defendants are nonetheless entitled to qualified immunity on these claims.

that the ABC Board lacked the authority under the Alcohol Beverage statute to impose Reimbursable Details as a condition on licenses.

The doctrine of qualified immunity shields government officials, who are sued in their individual capacity for money damages, for "conduct [that] does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to determine whether an individual is entitled to qualified immunity, the Court must answer two questions: 1) whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show that the [state official's] conduct violated a constitutional [or statutory] right," and 2) that "the [constitutional or statutory] right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although this Circuit has not explicitly decided whether state actors are entitled to qualified immunity on RICO claims, other circuits have routinely allowed defendants to raise qualified immunity as a defense in suits involving RICO. *See e.g.*, *Brown v. Nationsbank Corp.*, 188 F.3d 579, 587 (5th Cir. 1999); *Cullinan v. Abramson*, 128 F.3d 301, 308 (6th Cir. 1997); *See also Wilkie v. Robbins*, 551 U.S. 537, 568 (2007) (recognizing defendant's defense of qualified immunity to a RICO charge, but not inquiring "into the merits of his claim").

In this case, given that the D.C. Court of Appeals should likely interpret the Alcohol and Beverage statute's regulatory scheme in the first instance, the Court skips the first prong of the qualified immunity analysis and turns directly to the second. As the Supreme Court has recognized, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). That is certainly the case here.

The Court thus turns to the second prong of the qualified immunity analysis — whether it was clearly established, in June 2011, that the ABC Board lacked the authority to impose Reimbursable Details as a condition on licenses. In order for a law to be "clearly established" in the context of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right ....[I]n the light of pre-existing law, the unlawfulness must be apparent." *Wilson v. Layne*, 562 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This can be established through evidence of "controlling authority in [the state] jurisdiction at the time of the incident which clearly established the rule on which [the plaintiff] seeks to rely, [ ]or...a consensus of cases of persuasive authority such that a reasonable [state actor] could not have believed his actions were lawful." *Wilson*, 562 U.S. at 617. It is precisely where state law is undeveloped on the issue in question that state actors should be granted qualified immunity, as they "cannot be expected to predict the future course" of the relevant statute's interpretation. *Id.* Such is the case here.

D.C. Code §25-104(a) broadly grants the ABC Board the authority to "issue licenses to persons who meet the requirements set forth in this title." The statute further states:

> The Board, in issuing licenses, may require that *certain conditions be met* if it determines that the inclusion of the conditions will be *in the best interest of the locality*, section, or portion of the District where the licensed establishment is to be located. The Board, in setting the conditions, shall state, in writing, the rationale for the determination.

D.C. Code §25-104(e) (emphasis added). The Defendants argue that this statute grants them unparalleled latitude in issuing licenses and in imposing conditions upon those licenses, if they determine it to be in the best interest of the locality, as they did here. Indeed, this provision provides no limits on the Board's authority to issue such conditions.

The Plaintiff cites to several other provisions in the regulation in order to show that the Defendants' interpretation of their grant of authority is inconsistent with the greater statutory

scheme of the Alcohol and Beverage Regulation. However, Plaintiff cannot point to any controlling authority, or even a single interpretation of D.C. Code §25-104(a), that limits the ABC Board's authority to impose a Reimbursable Detail. Nor are the relevant regulatory provisions so clear, that a reasonable ABC Board official would understand that requiring a licensee to maintain a Reimbursable Detail violates the law. Thus, although the statutory provisions that Plaintiff cites contemplate *some* limits on the Board's authority, the scope of those limits or their applicability to the instant issue are neither explicit nor certain.

For example, Plaintiff points to the text of the Reimbursable Detail Subsidy Program, 23 DCMR §718, to argue that: 1) the regulation only contemplates *voluntary* agreements with the MPD to provide for reimbursable detail, 23 DCMR §718.1 ("A licensee, a group of licensees, or a Business Improvement District on behalf of licensees…*may enter* into an agreement with the MPD to provide for reimbursable detail and are eligible for reimbursement under the subsidy program.") (emphasis added); and, 2) the regulation precludes ABRA, and by extension the ABC Board, from "determining the number of MPD officers needed to work a reimbursable detail." 23 DCMR § 718.5.

Nevertheless, this program does not *specifically* constrain the power of the ABC Board to impose a Reimbursable Detail. First, as Defendants note, this provision only applies to ABRA, not to the ABC Board as a whole. And ABRA, as a sub-entity of the ABC Board, does not have all of the regulatory authority granted to the ABC Board. D.C. Code §25-202. In fact, the purpose of ABRA is merely to provide *assistance* to the Board in performing its functions. *Id.* As such, there may be limits placed on ABRA's authority to act that simply do not apply to the ABC Board. For example, ABRA's authority does not extend to *issuing* licenses — only the ABC Board is granted that authority. D.C. Code §25-104. This is not to say that 23 DCMR §718.5

definitively does not limit the ABC Board's authority, but if it does limit the Board's authority, it certainly was not clearly established as of June 2011.

Moreover, as indicated by its title, 23 DCMR §718 only appears to contemplate those instances in which a Reimbursable Detail may or may not be subsidized by the District, and is thus limited in its scope and applicability. For example, one plausible reading of the regulation could find that 23 DCMR §718 only applies to a subset of reimbursable details — those entered into voluntarily by the licensee. Under this reading, 23 DCMR §718.5 could restrict ABRA's authority to "determin[e] the number of MPD officers needed to work a reimbursable detail" in order to prevent ABRA's from mandating that *fewer* MPD officers work the reimbursable detail than agreed upon by the parties. It would do so because ABRA's limited funds may incentivize it to require that fewer MPD officers work the detail, so that ABRA can pay lower reimbursement costs. Moreover, it is entirely consistent under this reading that subsidies are only *available* for voluntary Reimbursable Detail agreements, thus nullifying any argument that this provision's reference to voluntary agreements must be read to *prohibit* mandatorily imposed Reimbursable Details. Accordingly, a "reasonable" member of the ABC Board could have believed that 23 DCMR §718 only regulates ABRA's authority when authorizing subsidies for voluntary agreements, and that it thus did not constrain the Board's authority to require a Reimbursable Detail as a condition upon licenses. At any rate, what this regulation means is not clearly established.

Plaintiff next argues that D.C. Code §25-798, which discusses voluntary agreements between licensees and the MPD to provide reimbursable detail services, highlights the permissive nature of the reimbursable detail program and thus undermines the ABC Board's interpretation. D.C. Code §25-798, entitled "Reimbursable details," states:

(b) A licensee or licensees, independently or in a group, *may enter* into an agreement with the MPD to provide for reimbursable details.

(c) Subject to adequate staffing of the police service areas and an assessment by the MPD of its staffing requirements, the MPD may staff reimbursable details as requested by the licensee. The MPD shall only use officers for this purpose who are overtime and would not otherwise be on duty at the time of the reimbursable detail.

(emphasis added). As with 23 DCMR §718 however, this statute does not specifically restrict the authority of the ABC Board. In fact, this provision does not even mention the ABC Board's authority to issue and place conditions upon licenses.

Finally, Plaintiff argues that D.C. Code §47-2820 circumscribes the Board's authority to impose Reimbursable Details at the rate of $55/hour — a rate much higher than the average hourly rate of an MPD officer. The applicable sentence of D.C. Code §47-2820 provides that "[p]olicemen and firemen [assigned to Reimbursable Detail] shall be charged for by the hour at the basic daily wage rate of policemen and firemen so assigned in effect the first day of the month for which the permit is sought." D.C. Code § 47-2820(b). Plaintiff thus argues that even if the Board has the authority to impose conditions upon licenses, D.C. Code §47-2820 clearly constrains its authority to set a wage higher than the daily wage rate.

First, Defendants contest that the ABC Board sets the wage rate when imposing a Reimbursable Detail condition. Def.'s Reply, 11; D.C. Code §25-798(b), (d) (noting that the MPD establishes policies and procedures to implement the section of reimbursable details). Moreover, even if the Defendants *were* setting the applicable rates, D.C. Code §47-2820 only applies to "[o]wners or managers of buildings in which skating rinks, fairs, carnivals, balls, dances, exhibitions, lectures or entertainments of any description including theatrical or dramatic performances of any kind are conducted." D.C. Code §47-2820(b). In fact, establishments that hold licenses under the Alcohol Beverage Statute are exempted from this provision. D.C. Code

§47-2820(b-2). Further, this provision again does not specifically address the Board's authority to issue licenses, the Board's authority to impose Reimbursable Details as conditions on those licenses, or the Board's authority to set rates for the Reimbursable Details.

None of this is to say that another court, analyzing the merits of Plaintiff's argument, and the content of the provisions cited above, would find that the ABC Board did indeed have the authority to impose Reimbursable Details. It is entirely plausible that these provisions, taken together, create a statutory scheme which only permits fully voluntary Reimbursable Details. However, the Plaintiff has not pointed to a single court ruling, or consensus of authority, that has established such an interpretation. "Given such an undeveloped state of the law," the Court finds that the Defendants could reasonably have believed their actions to be lawful, and could not have been "expected to predict the future course of statutory law." *Wilson*, 526 U.S. at 617. For this reason, the Court finds that Plaintiff's proposed interpretation was not "clearly established," and that the Defendants thus have qualified immunity on the RICO and Hobbs Act claims.

### D.  Equal Protection Clause

Plaintiff next alleges that the "imposition of the Reimbursable Details upon the Plaintiff but not all other similarly situated businesses" is a deprivation of the equal protection of the laws. Pl.'s Compl. ¶93. Plaintiff further alleges, under 42 U.S.C. §1985, that the Defendants , "as two or more people, conspired for the purpose of depriving the Plaintiff of equal protection of the laws." Because both counts require the Plaintiff to allege facts to state a claim for relief under the Equal Protection clause, the Court deals with the two counts jointly. The Defendants argue that Plaintiff fails to state a claim under the Equal Protection Clause because Plaintiff, a corporate entity, is not a member of any identifiable suspect class and is thus only afforded

rational basis review. Def.'s Mot. to Dismiss, at 12. And because the ABC Board imposes conditions on liquor licenses based on "the best interest of the locality," Defendants argue that the Board can assert a plainly legitimate government interest that satisfies rational basis review. *Id.*

Defendants' statement of the law is correct — "a classification neither involving fundamental rights nor proceeding along suspect lines…cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 U.S. 312, 319-20 (1993). However, Defendants' argument assumes that Plaintiff is not a member of a suspect class and that it is merely a "corporate entity." Plaintiff does not specify its classification in its Complaint. It merely states that it was treated differently from "similarly situated businesses." Compl. ¶ 93. However, Plaintiff does assert, albeit in its brief in opposition, that the Defendants repeatedly inquired into the kind of music playing at the establishment in order to determine whether the corporation "attracted too much of the wrong crowd (e.g. young black males) for their liking." Pl.'s Opp. at 23. Plaintiff further alleges that its establishment is "patronized almost entirely" by this suspect class. *Id.* at n. 13.

Unfortunately for the Plaintiff, these facts were not alleged in its Complaint, and the Court cannot consider facts alleged in the briefing when ruling on a Motion to Dismiss. "[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Coleman v. Pension Ben. Guar. Corp*., 94 F. Supp. 2d 18, 24, n.8 (D.D.C. 2000) (quoting *Morgan Distributing Co., Inc. v. Unidynamic Corp.,* 868 F. 2d 992, 995 (8th Cir.1989). As noted above, Plaintiff's complaint does not identify whether it is arguing for equal protection as a general corporate entity, or as an establishment patronized by a suspect class, upon which

basis it was disparately treated. Nevertheless, because Plaintiff's Equal Protection claim could potentially move forward had the claim included in the briefing been included in the Complaint, the Court allows the Plaintiff to amend its complaint as justice requires. However, even generalized claims of discrimination cannot survive a motion to dismiss if not supported by alleged facts. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that allegations of discriminatory treatment must include more than a "formulaic recitation of the elements" of a constitutional claim, and must instead show, with more than conclusory facts, that the defendants adopted and implemented a policy for the specific purpose of discriminating on the account of a protected status).

### E.  First Amendment Free Speech Claim

Plaintiff next alleges that the Reimbursable Detail is a constraint placed upon the Plaintiff in order to restrain content-based speech —playing certain types of music. Compl. ¶ 101-103. As Plaintiff recognizes, this challenge to the Board's order is an as-applied challenge. Pl.'s Opp'n, 22 n. 12. Defendants argue that Plaintiff has failed to state a claim under the First Amendment because the regulatory authority exercised by the ABC Board is content-neutral — the Reimbursable Detail was imposed to "ensure that Plaintiff followed noise regulations," which is a valid "time, place, manner" restriction. Def.'s Mot. to Dismiss, at 16.

Under the First Amendment, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). "Content-based laws are thus 'presumptively invalid, and the government bears the burden to rebut that presumption.'" *Act Now to Stop War and End Racism Coalition v. Dist. of Colum.*, 798 F. Supp. 2d. 134, 145-46 (quoting *United*

*States v. Playboy Entm't Grp.*, *Inc.*, 529 U.S. 803, 817 (2000)). However, if a law "impacts only the time, place or manner of expression," it will be considered content-neutral. *Id.* As Plaintiff correctly notes, music is protected as a First-Amendment speech right. *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1981). Nevertheless, the government may still impose reasonable restrictions on the time, place, and manner in which an individual or organization may exercise this right. *Ward*, 491 U.S. at 791.

Here, the Defendants argue that the statute is content neutral because it "makes no reference to music, either generally or of a specific kind. It concerns only the 'best interest' of the surrounding community." Def.'s Mot. to Dismiss at 16 (citation omitted). The Board justifies the Reimbursable Detail order because "noise" and "violent incidents" both adversely affect the local interest of the community. Because these are content-neutral justifications, and because these are significant government interests, Defendants argue that there is no First Amendment violation.

But this does not answer Plaintiff's claim — that although the regulation is facially content-neutral, Defendants' enforcement of the regulation discriminates based on content. *See* Pl.'s Opp'n, at 22-23. "Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality." *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011). One kind of as-applied challenge is "based on the idea that the law itself is neutral and constitutional…but that it has been enforced selectively in a viewpoint discriminatory way." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). In essence, the Plaintiff attacks the unwritten discriminatory policy, only manifested by the Board's application of its statutory authority. *See e.g.*, *Tipton v. Univ. of Hawaii*, 15 F.3d 922, 927 (9th Cir. 1994); *Yick*

*Wo v. Hopkins*, 118 U.S. 356 (1886). "Often the only way to establish whether such a policy exists is to extrapolate from enforcement data." *Hoye*, 633 F.3d at 855.

Unfortunately for the Plaintiff, it does not allege facts supporting this theory of selective enforcement in its Complaint. Instead it alleges in its Brief in Opposition that Defendants "repeatedly inquire[d] as to the kind of music playing at an establishment…to determine if such entertainment attracted too much of the wrong crowd (e.g. young black males) for their liking." Pl.'s Opp'n. at 23. As already noted above, the Court will not look to the briefing as an amendment of the Complaint. Nevertheless, because Plaintiff's First Amendment challenge could potentially move forward had such claim been included in the Complaint, the Court allows the Plaintiff to amend its complaint as justice requires. But again, the Plaintiff is warned that, when alleging discriminatory motivations, it must allege sufficient factual matter to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (holding that in an equal protection claim, plaintiff must allege sufficient facts showing that defendants adopted and implemented a policy for the specific purpose of discriminating on the account of a protected status).

### F. Fifth Amendment Takings Claim

Plaintiff finally argues that Defendants' imposition of police overtime details is an unconstitutional regulatory taking. It asserts that while on Reimbursable Detail, MPD officers are under no obligation to stay at the establishment they are being paid to patrol. If another emergency arises, they are free to respond, as they are on-duty officers. Pl.'s Compl. ¶22. Similarly, while on Reimbursable Detail, MPD officers cannot enter the paying establishment to respond to a problem within the premises. Pl.'s Compl. ¶23. Plaintiff thus asserts that it is paying twice for a general public service benefiting the public as a whole, resulting in an unconstitutional taking.

Defendants move for dismissal, arguing that: 1) payment of money is not a taking within the meaning of the Takings Clause; and, 2) that even if such payment could be considered a taking, the Government did not act in an irrational or arbitrary way — it merely required the establishment to share the costs of ameliorating the problems caused by the establishment. The Court agrees and dismisses Plaintiff's claim under the Takings Clause.

Defendants are correct in noting that five Justices of the Supreme Court have rejected the theory that "an obligation to pay money constitutes a taking." *Commonwealth Edison Co v. United States*, 271 F.3d 1327, 1339 (Fed. Cir. 2001) (explaining the plurality holding in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998)).  Since then, a majority of the federal appellate courts have held that a mere payment of money, without more, is not a taking within the meaning of the Takings Clause.  As explained in *Commonwealth Edison*, these holdings take various forms:

> Some courts have squarely held that money is not "property" within the meaning of the Takings Clause. *See, e.g., Unity Real Estate Co*., 178 F.3d at 674–78 (rejecting the application of a takings analysis to the tax imposed by the Coal Act); *Atlas Corp. v. United States*, 895 F.2d 745, 756 (Fed.Cir.1990) ("Requiring money to be spent is not a taking of property."). Other courts, taking a more transactional approach, have concluded that government-imposed obligations to pay money are not the sort of governmental actions subject to a takings analysis. *See Branch v. United States*, 69 F.3d 1571, 1576–77 (Fed.Cir.1995) ("[T]he principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability."); *Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 455 & n. 2 (2d Cir.1995) (per se takings analysis is inapplicable to congressional imposition of monetary liability); *Commercial Builders v. Sacramento*, 941 F.2d 872, 876 (9th Cir.1991) (a purely financial exaction does not constitute a taking). And still other courts have touched upon this issue in holding, for example, that monetary obligations incidentally imposed on a property holder as the result of the government's physical taking of real property (i.e., the cost of moving a business from condemned property) are not compensable. *See, e.g., United States v. General Motors Corp.*, 323 U.S. 373, 379–80 (1945). Taken together, these cases lead this court to conclude that a government-imposed payment of money cannot result in a compensable taking. *See Eastern*, 524 U.S. at 554 (Breyer, J., dissenting) ("This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money ....").

*Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29, 40-41 (Fed. Cl. 2000).

Moreover, as *Commonwealth Edison* recognizes, a theory under which simple monetary payments are considered a taking cannot comport with the theoretical underpinnings of the Fifth Amendment. After all, the "Takings Clause… is not prohibitory, but rather compensatory, in nature." *Id*. "[The Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. Cnty of Los Angeles*, 482 U.S. 304, 314–15 (1987) (emphasis in original) (citations omitted). If money payments were considered a taking, their "fair market value" would simply be the amount of money taken, and a government would be allowed to impose monetary obligations as long as it paid the individual the exact same amount in "fair compensation." *Branch v. United States*, 69 F.3d 1571, 1575-61 (Fed. Cir. 1995). Such a result is circular and nonsensical.

Plaintiff has not asserted any allegations under its Takings claim other than one based on an obligation to pay money. Nor has Plaintiff identified any case in which a mere obligation to pay an assessment, even where the individual paying such an assessment is not reaping the full benefit of the service paid for, is sufficient to establish a taking under the Fifth Amendment. For these reasons, the Court finds that Plaintiff has failed to sufficiently state a claim for relief under the Fifth Amendment Takings Clause and thus dismisses this claim.

### G. Qualified Immunity for Plaintiff's Constitutional Claims

Defendants finally ask the Court to dismiss Plaintiff's constitutional claims under the doctrine of qualified immunity, which, as set forth above, shields government officials being sued for money damages, so long as their "conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to determine whether an individual is entitled to qualified immunity, the Court must answer two questions: 1) whether "[t]aken in the light most favorable to the party asserting the injury…the facts alleged show that the [state official's] conduct violated a constitutional right," and 2) that the constitutional right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The Court, however, cannot rule on the qualified immunity question with respect to the constitutional claims at this time. Of the three constitutional claims raised by Plaintiff, the Court has dismissed one outright, and has dismissed the other two but granted the Plaintiff leave to amend his complaint on those claims. Because there currently remains no viable constitutional claim remaining, the Court does not have sufficient information to determine the answer to either of the two questions articulated in *Saucier*.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted, but Plaintiff is granted leave to amend its claims brought pursuant to the Equal Protection Clause and the First Amendment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2014                                      RUDOLPH CONTRERAS
                                                           United States District Judge